United States District Court
for the Southern District of Ohio
Western Division

| | |
|---|---|
| United States of America,<br><br>    Plaintiff,<br>v.<br><br>William DeFoor,<br><br>    Defendant. | Case No. 1:26-cr-001<br><br>District Judge Douglas R. Cole |

Defendant's Motion to Revoke Order of Detention

Comes now the Defendant, Mr. William DeFoor ("Mr. DeFoor"), and moves the Court pursuant to 18 U.S.C. § 1342(b) for an order revoking the order of detention issued in the matter on January 13, 2026 by the Magistrate Judge. (Doc. 11) A memorandum in support of this motion is set forth below.

Memorandum in Support

*(a)* *Introduction and factual background*

Mr. DeFoor stands charged with one count of an act of physical violence against property in restricted building or grounds pursuant to 18 U.S.C. § 1752(a)(4) and (b)(1)(A); one count of willful injury or depredation of property of the United States pursuant to 18 U.S.C. § 1361; and one count of impeding certain officers or employees pursuant to 18 U.S.C. § 111(a)(1) and (b). These charges stem from an incident that occurred shortly after midnight on January 5, 2026. On that day, while in the midst of a significant mental health crisis, Mr. DeFoor used a hammer to break several windows at the local residence of the Vice President and was promptly detained by several Secret Service Agents. At time of this occurrence, neither the Vice President nor his family

were in the home. Upon information and belief, the only individuals present other than Mr. DeFoor were the Secret Service Agents assigned to watch the Vice President's home. Mr. DeFoor, whose conduct is clearly attributable to his long struggle with schizophrenia, is now subject to an order of detention pending trial. Mr. DeFoor appeals this order and respectfully requests that this Court release him to a locked-door mental health facility until such time as the proper treatment can be provided and assessments conducted sufficient to give the Court confidence that Mr. DeFoor can be released under the supervision of Pretrial Services pending trial. In the alternative, should the assessments to be conducted advise the Court that further detention and/or treatment is warranted or necessary, the Court can, and should, so order.

The Bail Reform Act which governs release and detention determinations provides that several categories of severe crimes carry a rebuttable proposition of detention. Notably, the offenses charged against Mr. DeFoor involve property damage and the federal versions of trespassing and the obstruction inherent in failing to abide by an officer's commands. As such, and not surprisingly, none are offenses that carry a presumption of detention. Rather, as in any other case that does not a carry a presumption of detention, "the default position of the law is that a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939 (6th Cir. 2010).

Furthermore, the Pretrial Services Report issued in this matter recommended that Mr. DeFoor be released pending trial subject to series of well-considered conditions. This recommendation should be considered weighty as Pretrial Service is in a unique position to assess and advise the court of the releasability of any defendant. The recommendations by Pretrial Services are not arbitrary but rather are based on a thorough and objective investigation of the defendant's circumstances. In this evaluation Pretrial Services examine numerous factors including but not limited to criminal record, prior failures to appear, and the current offense type.

Pretrial Services support their investigative process by employing the best available scientific data to inform release and detention decisions. Additionally, Pretrial Services makes an individual assessment of each individual defendant to determine if release is warranted in the matter at hand and suggest conditions that would facilitate the defendant's release pending trial.

As for Mr. DeFoor, Pretrial Services recommended that he be released pending trial with special conditions designed to ensure his appearance for court and the safety of the community. The full list of recommended conditions can be found in Mr. DeFoor's Pretrial Service Report, but the list included recommendations that he participate in mental health counseling as recommended by Pretrial Services. As discussed in greater detail below, Mr. DeFoor's recommendation is that he be released into a locked-door psychiatric facility, a level of supervision and control beyond even that recommended by Pretrial Services. This placement would be further guaranteed by use of electronic monitoring subject to real-time GPS confirmation.

Nonetheless, the Magistrate Judge ordered that Mr. DeFoor be detained pending trial as she did not belief any combination of conditions was sufficient to ensure Mr. DeFoor's appearance and the safety of the community. The Magistrate Judge acknowledged Mr. DeFoor's need for treatment but seemed to place undue influence on the uncertainly of his future prognosis specifically stating, "If I could be assured that it was a situation where treatment would be obtained, he would be restored, and that would continue, I think we would be in a different situation." (Doc. 13, Transcript of Detention Hearing, PAGEID# 68) As respectfully argued below, such uncertainty is not a just basis for Mr. DeFoor's continued detention. The Magistrate Judge ultimately concluded that there were no conditions sufficient to reasonably ensure the safety of the community and Mr. DeFoor's appearance and ordered that he be detained pending trial.

Yet, the Bail Reform Act requires in cases where detention is not presumed, such as this case, that courts find the least restrictive condition or combination of conditions needed to reasonably assure a defendant's appearance in court and to protect the community.  This is not an easy determination in any case, but such difficulty is insufficient grounds to warrant detention.  In the current matter this determination is complicated by the fact that the property damaged was the home of the Vice President.  But this is a case of mental illness, not of politics, and when this political cloud is brushed aside it becomes readily apparent that pre-trial detention is not necessitated by the facts of this case nor Mr. DeFoor's history and that adequate conditions exist to reasonably ensure both Mr. DeFoor's appearance and protect the community.

For the following reasons, this honorable court should revoke the Magistrate Judge's order of detention and release Mr. DeFoor pending trial under specialized conditions that will ensure the safety of the community and Mr. DeFoor's appearance in court while also respecting Mr. DeFoor's rights.  With respect to the concerns expressed by the Magistrate Judge, Mr. DeFoor highlights that he has successfully undergone in-patient treatment for his conditions at a residential facility in the past and is able to do so again.  Mr. DeFoor's family has made arrangements for him to be treated at a locked-door facility where he was successfully treated in the past.  If acceptable, Mr. DeFoor will remain in said facility for a period of approximately 90 days while he undergoes treatment as well as court ordered assessments of his competency and potential capacity for being found not guilty by reason of insanity.  Those assessments alone will provide the Court with significant additional information regarding Mr. DeFoor's continued detention.  If the appropriate mental health experts appointed by the Court find him to be competent and stabilized by the treatment received, then Mr. DeFoor ought to be released under the supervision of Pretrial Services as concerns regarding his condition will have been alleviated.  On the other hand, should his mental

health status at that time justify findings sufficient to warrant further hospitalization, the Court can enter such orders at that time once it is possessed of the requisite information to do so. One way or the other, the uncertainty of what might present 90 days from now is an insufficient basis to maintain Mr. DeFoor's detention in light of the presumption of his release.

 (b) *Applicable law*

  District courts are empowered to review a Magistrate Judge's order of detention upon motion for revocation by the defendant. 18 U.S.C. § 1342(b). Such motions are to be determined promptly. *Id*. The Sixth Circuit has not explicitly pronounced a standard of review for the district courts to employ when reviewing orders of release or detention but has noted a district court's use of *de novo* review without comment. *See United States v. Hazime*, 762 F.2d 34 (6th Cir. 1985). Other circuits, however, have explicitly ruled that district courts are to review release and detention decisions *de novo*. *See United States v. Cisneros*, 328 F.3d 610 (10th Cir. 2003); *United States v. Koenig*, 912 F.2d 1190 (9th Cir. 1990); *United States v. Westbrook*, 780 F.2d 1185 (5th Cir. 1986); *United States v. Leon*, 766 F.2d 77 (2nd Cir. 1985). In line with these circuits, courts in the Southern District of Ohio review orders of release or detention *de novo*. *See United States v. Mehmed*, 748 F. Supp 3d 549 (S.D. Ohio 2024); *United Stats v. Yamini*, 91 F. Supp 2d 1125 (S.D. Ohio 2000).

  "The default position of the law … is that a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). However, 18 U.S.C. § 3142(e) provides that when a defendant has been indicted for an alleged offense that falls into one of several enumerated categories "it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." 18 U.S.C. § 3142(e)(3); *Stone*, 608 F.3d at 945. The Government bears the burden of persuasion at

5

all times and must show by clear and convincing evidence that the defendant is a danger to another person or the community, or by a preponderance of the evidence that the person is a flight risk. *Stone*, 608 F.3d.; 18 U.S.C. § 3142(f)(2)(B).

18 U.S.C. § 3142(g) identifies four factors to be considered when determining conditions of release or if detention is warranted; (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. Judicial officers are tasked with analyzing these four factors to determine what conditions will reasonably ensure the defendant's appearance and the safety of the community.

(c)     *Argument*

Mr. DeFoor needs treatment and a stable environment, not pre-trial detention. The Magistrate Judge's order of detention is unwarranted and should be revoked for several reasons. First, Mr. DeFoor is in a category of defendants that both appear in court and avoid criminal conduct at a very high rate. Second, Mr. DeFoor is not charged with an offense enumerated under 18 U.S.C. § 3142(e) and thus the default position of the law that "defendant[s] should be released pending trial" applies. *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). Third, analysis of the 18 U.S.C. § 3142(e)(1) factors supports release and suggests that Mr. DeFoor can be released from pre-trial detention under conditions that ensure his appearance and the safety of the community. And finally, the fact that the windows that were broken by a presumptively delusional young man in a mental health crisis belonged to the Vice President is quite simply not an issue which should control this Court's decision.

(1)     The nature and circumstance of the offense

Mr. DeFoor's alleged offense conduct was using a hammer to damage two windows and a car and refusing to listen to the orders of Secret Service Agents.  Put more succinctly, while in the midst of an ongoing mental health crisis a young person damaged property and did not listen to someone shouting at him.  These circumstances are only noteworthy for one reason; it just so happens that this occurred at the home of the Vice President.  But for that fact, detention would never be considered in a case such as this.  That fact could arguably be relevant if this were somehow a political attack, but the government has acknowledged there is no proof that this was a political attack. (Doc. 13, Transcript of Detention Hearing, PAGEID# 68)  In fact, the question of whether Mr. DeFoor even possessed the ability to comprehend what he was doing in that moment is still an open question.  But, in the absence of evidence to the contrary, this Court ought to treat Mr. DeFoor as precisely what he was – a delusional young man in the midst of a mental health crisis, not some existential threat to democracy.

The Magistrate Judge's decision cites Mr. DeFoor's use of a hammer as possibly indicative of the potential risk he poses.  The hammer was not used as a weapon against any person, however, but was simply used to break some windows and hit a car.  While admittedly alarming and inappropriate, these acts of vandalism do not support the conclusion that Mr. DeFoor somehow poses an active threat to the community.  Furthermore, the alleged conduct of Mr. DeFoor must be considered in the light of the reality that he is a long-suffering schizophrenic who was in the midst of a mental health episode. Any potential risk posed by that reality can be mitigated by placing Mr. DeFoor in a locked-door inpatient mental health facility until the Court can be confident that he is stabilized.

(2)	The weight of the evidence

In making release and detention determinations the "weight of the evidence" does not modify or limit the defendant's presumption of innocence. 18 U.S.C. 3142(g). Rather, this factor goes to the dangerousness of the defendant. *See United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985). Congress has specifically highlighted crimes of violence and crimes involving a "firearm, explosive, or destructive device" as being indicative of dangerousness. *United States v. Stone*, 608 F.3d 939, 947 (6th Cir. 2010). The charged crimes in current matter are not crimes of violence, nor did Mr. DeFoor employ a firearm, explosive, or destructive device. Rather the specific evidence put forward does not suggest that Mr. DeFoor is dangerous regardless of what it suggests about his potential guilt.

While in the midst of a mental health crisis, Mr. DeFoor used a hammer to damage a home and a car. This is not the behavior of an inherently violent person, merely a person in crisis. This is corroborated by Mr. DeFoor's minimal criminal history. In fact, Mr. DeFoor has never been convicted of the sort of violent offense that would suggest he poses a danger to society. As can be seen in the Pretrial Services Report, Mr. DeFoor's past run-ins with the law were for circumstances somewhat similar to this case where, while in the midst of mental health crises, he trespassed and/or damaged property. This evidences that Mr. DeFoor is not a violent person but an ill person whose limited criminal history is inexorably intertwined with his mental health struggles.

The weight of the evidence in this matter fails to show that Mr. DeFoor represents any active threat to the public. To the contrary, it seems abundantly clear that at the time of the incident Mr. DeFoor was in the midst of a crisis and likely could not understand what he or those around him were doing. There is no evidence presented that supports an inference of anything beyond this crisis. The evidence shows simply that Mr. DeFoor is a young person who damaged property

8

while in the midst of a mental health episode, and not a person seeking to politically target the Vice President with violence. As such, the evidence does not suggest that Mr. DeFoor poses a risk to people or the community and weighs in favor of his release pending trial.

    (3)    <u>The history and characteristics of Mr. DeFoor</u>

Mr. DeFoor, 26, has been a resident of Greater Cincinnati for most of his life. He had a healthy childhood and, absent a brief struggle with depression during high school, an extremely accomplished adolescence. He grew up the oldest of three siblings in a loving and supportive home on the east side of Cincinnati. Desiring to be a professional musician he attended the University of Cincinnati Conservatory of Music on a full scholarship. Unfortunately, while at college Mr. DeFoor's mental health entered into a slow decline. The onset of the COVID-19 pandemic in 2020 only amplified Mr. DeFoor's challenges as he moved back to the family home. He began to struggle with simple tasks that he once would have handled with ease. His temper became unpredictable and he would argue about strange things with his loved ones. It soon became apparent to Mr. DeFoor's family that he was unwell and beginning to suffer from a significant mental illness.

Mr. DeFoor ultimately left home between approximately 2021 and 2023 and spent those years bouncing between unstable housing and employment. Though his family attempted to support him, his mental health struggles prevented him from holding steady employment and he was in and out of various shelters and long-stay hotels. Mr. DeFoor finally returned home in the summer of 2023, and the family began working to address his mental health issues. Mr. DeFoor often appeared incoherent and distracted, and his parents soon realized that he was hearing and responding to voices that only he could hear. It was during this period that Mr. DeFoor was charged with trespassing because he would not leave the waiting room of the University of Cincinnati

Psychiatric Services emergency room. The government has pointed to that case as evidence that Mr. DeFoor is allegedly a flight risk because he failed to appear three times in that matter and warrants were issued for his arrest. Notably, each of those warrants was either withdrawn by the court or recited when Mr. DeFoor voluntarily made himself available to the court. Rather than suggest Mr. DeFoor is a flight risk, those events suggest at worst that Mr. DeFoor struggled to keep a schedule while in the midst of the worst bouts of his mental illness. That matter was ultimately dismissed when Mr. DeFoor was found incompetent to stand trial.

As time passed, Mr. DeFoor's family began to gain an understanding of his mental health struggles. Doctors were able to diagnose Mr. DeFoor with schizophrenia and begin a course of treatment. The Pretrial Services Report accurately lays out many of the specific details of Mr. DeFoor's treatment and care and they will not be reiterated here. There were, however, bumps along the way, including Mr. DeFoor's 2024 arrest for vandalism when he broke a window, albeit a far less noteworthy one, belonging to a local business. Mr. DeFoor's compliance with the court proceedings and treatment in that matter should provide this Court with a sound basis to believe that he will respond as successfully here. Following that incident, Mr. DeFoor was admitted to a locked-door mental health facility where he remained for approximately 60 days. During that time, Mr. DeFoor stabilized and settled upon a pharmaceutical treatment regimen that helped him maintain and thrive. Mr. DeFoor manage his symptoms successfully for over a year following his release from that facility. His quality of life improved significantly, his hallucinations diminished, and he again began working on his bachelor's degree. This was a time of great hope for Mr. DeFoor and his family.

Sadly, the battle with mental illness is a long and difficult one even with a supportive family and excellent medical professionals on one's side. Mr. DeFoor knows this better than anyone. In

December 2025, Mr. DeFoor began struggling with symptoms of his schizophrenia again. His family and treating psychiatrist saw the changes and had already taken steps to adjust his medications. A letter from Dr. Johnston outlining these specific steps was provided to Pretrial Services and should be available to the Court as part of the Pretrial Services Report. As discussed therein, Mr. DeFoor and his family were discussing his return to a hospital setting as the change in medication slowly took effect. Unfortunately, the incident leading to this case occurred before this could be accomplished.

Mr. DeFoor is not a dangerous or a violent person, nor does he represent a risk of flight. Like millions of Americans, he suffers from the disease of mental illness, a disease that was well controlled for a significant period of time before the incident leading to these unfortunate circumstances. Mr. DeFoor's disease is manageable as evidenced by his growth and healing throughout 2024 and 2025. Even when his disease spirals out of control, he has only damaged property and not harmed others. This is true of his past run-ins with the law, and it is just as true of this incident. Mr. DeFoor is a kind and sensitive person who needs treatment, not a cell. For all the foregoing reasons, Mr. DeFoor's history and characteristics weigh in favor of his release.

>   (4)   <u>The nature and seriousness of the danger to any person or the community that would be posed by the person's release</u>

No serious danger is posed to the community or any individual person if Mr. DeFoor is placed in a psychiatric hospital. The crime in this matter is not a crime against persons but a crime against property. Mr. DeFoor has not displayed violent tendencies towards any person in this matter or in his past contacts with the criminal justice system. This therefore suggests that he will not pose a threat to the community. Rather, it suggests that even when in crisis Mr. DeFoor is unlikely to harm persons but, at worst, has caused damage to only property.

The government will likely vociferously argue, however, that the "property" at question in this case belonged to the Vice President. That distinction should only inform the Court's decision if the government is able to prove that this was somehow a political act directed at the Vice President as opposed to a delusional response to an unknowable trigger that could have just as easily drawn Mr. DeFoor to any other location. As stated above, the government has acknowledged it has no proof that this was a political act by Mr. DeFoor. This lack of evidence does not exist in a vacuum, however, but was willingly and significantly assisted by the DeFoor family and Mr. DeFoor himself. Within hours of the events which occurred shortly after midnight on January 5th, Mr. DeFoor's parents met with Secret Service agents and allowed for a voluntary search of their home. They further provided all of Mr. DeFoor's electronic devices including phones, tablets, and a laptop computer, in addition to the codes and passwords to access those devices. When the government acknowledges that it has no evidence of sinister political intent by Mr. DeFoor, that absence is not due to a lack of either access or effort. Rather, it is purely indicative of the inherent absence of such evidence. In the absence of such proof what remains is purely a case of mental illness, albeit one misdirected toward the Vice President assuming, arguendo, that Mr. DeFoor was even capable and cognizant of such direction in the first place.

That Mr. DeFoor is not dangerous and should be released is further informed by the similarity of this matter to another recent case within the Southern District wherein a defendant with a history of mental illness was released pending trial after damaging federal property. In *United States v. Funderburke*, Dwayne Funderburke a 42-year-old-man with a history of schizophrenia and drug abuse drove his car into the barricades of the parking lot outside the Joseph P. Kinneary Federal Courthouse in Columbus. (Doc. 12, Gov. Mot. To Appeal and Revoke Order of Release, *United States v. Funderburke*, No. 2:25-mj-534 (S.D. Ohio 2025))  Mr. Funderburke

12

then used a metal trash can to smash through the glass doors of the courthouse before he was ultimately detained two hours later. *Id.* Mr. Funderburke was released pending trial by the Magistrate Judge who ordered that he be placed into a residential treatment program, and this order was upheld by the district court. (Doc. 22, Memorandum Order Denying Gov. Mot. To Appeal and Revoke Order of Release, *United States v. Funderburke*, No. 2:25-mj-534, (S.D. Ohio 2025)). In their motion seeking revocation of bond, the government argued that Mr. Funderburke was dangerous and should not be released because he somehow targeted the federal courthouse as revenge for having been sentenced there 17 years earlier. As here, the defense in that case pointed out that Mr. Funderburke was "an individual with a history of schizophrenia and bipolar disorder" who attacked the unoccupied federal courthouse while in presumptive psychotic state. (Doc. 15, Def. Opp. to Mot. to Revoke Order of Release, *United States v. Funderburke*, No. 2:25-mj-534, (S.D. Ohio 2025)). The district court was unpersuaded by the government's argument and reasoned that Mr. Funderburke should be released as his alleged offense was not an enumerated offense under 18 U.S.C. 3142(e) and that the 3142(g) factors leaned in favor of his release. (Doc. 22, Memorandum Order Denying Gov. Mot. To Appeal and Revoke Order of Release, *United States v. Funderburke*, No. 2:25-MJ-534, (S.D. Ohio 2025)*.* The 3142(g) factors were specifically found to support release because Mr. Funderburke's crime was not a crime of violence nor a drug offense, and there were suitable conditions to ensure the safety of the community and his appearance in court. *Id.*

      Like in *Funderburke*, the government here attempts to cast aspersions on Mr. DeFoor and claim he was targeting the Vice President despite having no real evidence to this point. Mr. DeFoor is a mentally ill individual who suffers from schizophrenia and hallucinations. Attributing animus or premeditation to him because the house he happened to damage was the Vice President's is

13

unjustified and unsupported by the known evidence. Even if Mr. DeFoor knew who owned the home, just as Mr. Funderburke presumably knew it was in fact the federal courthouse he was attacking, both men were ill, both men were in the midst of mental health crisis, and both men were ultimately appropriate for pretrial release pursuant to proper conditions. There is no clear and convincing evidence that Mr. DeFoor will pose a danger to the Vice President or anyone else should he be released. This factor therefore weighs in favor Mr. DeFoor's placement in a locked-door psychiatric hospital either until he stabilized enough to give the Court confidence, or until sufficient assessments have been conducted to warrant his further detention.

*(d)  Conclusion*

Mr. DeFoor respectfully requests that his order of detention pending trial be revoked and he be granted an order of release pending trial subject to the conditions outlined by Pretrial Services. Once appropriate arrangements have been made, he can be released into a locked-door mental health facility subject to additional electronic monitoring. Only after treatment and assessment have been conducted at that facility can the Court properly determine what conditions of either release or continued detention should follow.

Respectfully submitted,

_____
Paul M. Laufman (0066667)
Laufman Napolitano, LLC
4210 Hunt Road
Cincinnati, OH 45242
(513) 621-4556
(513) 621-5563 Fax
plaufman@LN-lawfirm.com
*Counsel for Defendant William DeFoor*

15

<u>Certificate of Service</u>

  I hereby certify that a copy of the foregoing pleading was electronically filed on the 29th day of January 2026.  Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's electronic filing system.

                 _____
                 Paul M. Laufman