# UNITED STATES DISTRICT COURTS
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 1:26-CR-001 |
| Plaintiff, | : | |
| v. | : | JUDGE DOUGLAS R. COLE |
| WILLIAM D. DeFOOR, | : | |
| Defendant. | : | |

## RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO REVOKE ORDER OF DETENTION

Just after midnight on January 5, 2026, William DeFoor arrived at the Cincinnati residence of the Vice President of the United States. He was armed with a hammer and had one objective: to attack the home of the Vice President. He succeeded. DeFoor traveled on foot from his home on Observatory Place to William Howard Taft Road. He walked over three miles, in extremely cold conditions, carrying only a black backpack which held a hammer. He did not carry any type of identification. He did not have a cellular phone. His movements and actions were purposeful and deliberate. Whether or not they were motivated by political ideology remains unknown. What is known without question is that his intended target was the home of the Vice President.

Because DeFoor poses a risk of flight and a danger to the community, at the detention hearing the United States requested DeFoor be detained pending trial. The Magistrate Judge agreed and ordered DeFoor detained. For the reasons stated below, the United States respectfully requests the order of detention remain intact.

## BACKGROUND

In a criminal complaint filed January 5, 2026, DeFoor was charged with three federal

felony offenses: (1) Depredation Against U.S. Property in violation of 18 U.S.C. § 1361; (2) Act of Physical Violence Against Person or Property in Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4); and (3) Forcibly Assaults, Resists, Opposes, Impedes, Intimidates, or Interferes with any Person in Performance of Their Official Duties in violation of 18 U.S.C. § 111(a)(1). *See United States v. William D. DeFoor*, Case No. 1:26-mj-0008. His arrest was the result of DeFoor striking a United States Secret Service owned vehicle with a hammer, then quickly turning his attention to the home of the Vice President. As he approached the residence, a Secret Service Special Agent attempted to engage him with verbal commands to stop. He did not. After causing the damage he intended to cause, he dropped his weapon and attempted to run away. He was stopped by officers with the Cincinnati Police Department, as well as Secret Service Agents, and arrested without incident.

DeFoor was brought before Chief Magistrate Judge Stephanie K. Bowman on January 6, 2026, for initial appearance. He was ordered temporarily detained pending a detention hearing. (R. 8, Order of Temporary Detention, PAGE ID# 13)[1]. At the January 9, 2026, detention hearing, the United States set forth the reasons detention was appropriate. The Magistrate Judge agreed, ordering DeFoor detained pending trial. (R. 11, Order of Detention Pending Trial, PAGE ID# 26). Specifically, the Magistrate Judge found the United States had satisfied its burden that DeFoor presented a danger to the community and a risk of nonappearance. (Id., PAGE ID# 27). Additionally, the Magistrate Judge identified numerous reasons for detention, which included (1) the weight of the evidence against the defendant is strong; (2) he is subject to a lengthy period of incarceration if convicted; (3) he has a prior criminal history; (4) he participated in criminal activity

---

[1] Citations to the record include the record entry number, a brief description, and the PAGE ID#.

2

while on probation, parole, or supervision; (5) he has a history of violence or use of a weapon; (6) he lacks stable employment; (7) he has prior failures to appear in court as ordered; and (8) he has previously attempted to evade law enforcement. *Id.* This matter is now before the Court on DeFoor's motion to revoke the Magistrate Judge's detention order. The United States disagrees with DeFoor's arguments and respectfully recommends he be detained pending trial.

## LEGAL STANDARD

A person charged with a federal crime does not have an absolute right to pretrial release following an arrest. *United States v. Salerno*, 481 U.S. 739, 755 (1987). A defendant must be detained pending trial if a judicial officer concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). In making this determination, a court considers the following factors: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) this history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g)(1)-(4). A finding of a risk of non-appearance must be supported by a preponderance of the evidence, and a finding of dangerousness must be supported by clear and convincing evidence. *United States v. Hinton*, 113 F.App'x 76, 77 (6th Cir. 2004).

If a magistrate judge orders a defendant detained pending trial, the defendant "may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b). The district court is empowered to review a magistrate judge's order related to detention or release and should "make its own '*de novo*' determination of facts." *United States v. Yamini*, 91 F.Supp. 2d, 1125, 1128 (S.D. Ohio 2000) (citations omitted). Under

the Bail Reform Act, "a defendant may be detained pending trial only if a judicial officer 'finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *United States v. Stone*, 608 F.3d 939, 947 (6th Cir. 2010) (quoting 18 U.S.C. § 3142(e)). A motion for revocation of a detention order must be decided "promptly." 18 U.S.C. § 3145(b).

## ARGUMENT

DeFoor should be detained pending trial. Each of the factors the Court must consider in determining whether there is any condition or combination of conditions that will reasonably ensure the safety of any other person or the community, as well as assure the appearance of DeFoor, weigh in favor of continued detention.

### A. The Nature and Circumstances of the Offense

The nature and circumstances of DeFoor's offense cannot be minimized as just a "property damage" offense, "the federal versions of trespassing … [and] failing to abide by an officer's commands." (R. 18, Defendant's Motion, PAGE ID #44). The United States understands DeFoor's attempts to paint this incident as trivial by stating his "offense conduct was using a hammer to damage two windows and a car and refusing to listen to the orders of Secret Service Agents." (Id., PAGE ID #49). DeFoor frames his conduct as being "only noteworthy for one reason; it just so happens that this occurred at the home of the Vice President." *Id.* This incident cannot be taken in such a caviler manner. DeFoor did not just stumble upon the home of the Vice President after midnight. He did not wander over three miles and "just so happen" to arrive at the driveway of the second most powerful man in United States government. The evidence in this case shows DeFoor's actions were intended to target the home of the Vice President. Whether that

4

is because of political disfavor is irrelevant.

While evidence continues to be analyzed, Ring doorbell footage shows DeFoor exited the front door of his home at approximately 8:16 p.m. He was wearing a dark jacket, dark pants, and appeared to have an earbud in his right ear. He was not wearing gloves, and his hands were empty. After closing the front door, DeFoor walked down the front porch area toward the driveway and appeared to bear a left toward the rear of the house. He was not observed on the Ring doorbell the remainder of the evening. When DeFoor was arrested over four hours later, he did not have any electronic devices on him and was not wearing an earbud. He was wearing gloves and was seen carrying a black backpack prior to taking a hammer from it and discarding the backpack on the sidewalk near the Vice President's home. It appears DeFoor left his phone and earbud at his home where they were later found following his arrest. Before leaving his home, he grabbed gloves, the backpack, and a hammer before heading toward the Vice President's home.

After DeFoor's arrest, agents took possession of his cellular phone that he left in his home. Review of the phone shows DeFoor was accessing various applications until shortly after 10:15 p.m. Government's Exhibit 1 shows a possible path DeFoor took from his home to the Vice Presidents. It would have taken DeFoor nearly an hour and a half to reach his destination. Government's Exhibit 2 shows a satellite version of the same route. A closer look at this exhibit reveals hundreds of houses between DeFoor's home and the Vice Presidents. Government's Exhibit 3 shows a fraction of the path DeFoor took as he left his home and the many homes he passed just after he left. He attacked none of those homes in the late evening hours of January 4, 2026. Considering when he left his home and the length of time it took him to reach the Vice President's home, it is evident DeFoor knew where he was going. The fact he was carrying a

5

backpack containing a hammer shows his intentions to cause damage when he arrived. His path and conduct were deliberate and intentional. Whether or not his motive was rooted in political reasons is not fully known. Whether or not his intended target was the Vice President of the United States is without question.

**B.     The Weight of the Evidence Against the Defendant**

The Sixth Circuit has explained, "this factor goes to the weight of the evidence of dangerousness, not the weight of the evidence of the defendant's guilt." *United States v. Stone,* 608 F.3d 939, 948 (6th Cir. 2010). Here, the weight of the evidence of dangerousness and the weight of the evidence of guilt overlaps. *See United States v. Busbin*, 2024 WL 1313880, at 13, n. 13 ("Notably, however, the weight of the evidence of dangerousness can, in some cases, be enhanced by substantial weight of the evidence of guilt; this is because when the charges against a defendant themselves reflect dangerous conduct, evidence of guilt on those charges in come cases tends to reflect an ongoing danger to other persons or the community.").

The weight of the evidence against DeFoor is overwhelming. There is no dispute DeFoor engaged in this conduct. He was observed by a Secret Service Special Agent approaching the home with what was first believed to be a hatchet. He was observed causing damage to both the vehicle owned by the Secret Service and the Vice President's home. He was pursued a short distance and caught by law enforcement. These facts are not disputed.

DeFoor repeats throughout his motion this matter is only "noteworthy" because he attacked the home of the Vice President. That argument is a double-edged sword, much like his argument's related to DeFoor's significant mental health issues. It is not a federal crime to cause damage to a vehicle parked in a driveway. It is when that vehicle belongs to a federal law enforcement agency.

It is not a federal crime to vandalize a home and cause thousands of dollars' worth of damage by breaking windows. It is when the home belongs to the Vice President and is a protected asset of the United States Secret Service.

Government's Exhibit 4 depicts the western view of the fence line in front of the Vice President's home. This shows the path DeFoor took while approaching the residence. Along the way, DeFoor passed multiple signs warning that the area was restricted property, and violations would be subject to criminal prosecution. DeFoor ignored those warnings and breached the property. It is along this fence line that DeFoor is seen removing the hammer from his backpack before dropping it to the sidewalk and running toward the Vice President's home. Again, DeFoor knew where he was going and knew what he was going to do when he arrived.

### C. The History and Characteristics of the Defendant

A careful review of DeFoor's background reveals a troubled individual. The United States is sympathetic to anyone who suffers from mental health issues. It is apparent that DeFoor suffers significantly. Indeed, his counsel attributes his conduct to him being "in the midst of a mental health crisis." (R. 18, Defendant's Motion, PAGE ID# 50). While the United States agrees DeFoor has a history of mental health issues, it is not at all apparent that whether his criminal conduct in this case was motivated solely by those issues. In fact, as discussed above, the evidence very much indicates that DeFoor knew he was attacking the Vice President's residence.

DeFoor makes much of the fact that he has successfully gone to inpatient treatment for his mental health conditions at a residential facility in the past and therefore "is able to do so again." The argument cannot withstand scrutiny. The mental health facility he requests to be placed is first and foremost a health care provider, not a detention facility where this Court can exercise custodial

7

control. The reality is that DeFoor's past mental health treatment failed in preventing him from engaging in the conduct at issue in this case. And given this track record, the Court simply cannot rely upon assurances from DeFoor that mental health treatment will adequately address the community safety and non-appearance concerns that the Magistrate Judge relied upon in ordering DeFoor detained.

    **D.**    **The Nature and Seriousness of the Danger to Any Person or the Community that would be Posed by the Defendant's Release**

At the time of DeFoor's criminal conduct in this matter, he was under the guardianship of his parents. Despite that, he left their home in the dead of night to attack the home of the Vice President. Anyone who is so bold as to approach the home of the Vice President of the United States, while armed with a hammer, with the intent to cause damage, is, by any reasonable definition, a dangerous person. Damaging anyone's home is not simply a "window breaking" incident. A home is where people go to feel safe and secure. It's where children run around bare feet to play. DeFoor violated that safety and security. He attempts to minimize this violation because the Vice President and his family were not home at the time.[2] That is irrelevant. Attacking someone's home, whether they are present or not, is an intentional act to cause fear. That conduct is bad enough. It is amplified when it committed against the family home of the man who holds the second highest office in the United States. In this regard, DeFoor's attempt to liken the detention decision in this case to that in *United States v. Funderburke* must be rejected. As the Court knows, the Bail Reform Act must be applied to the facts and circumstances of each given case and each individual defendant.

In *United States v. Dwayne K. Funderburke*, Case No.: 2:25-mj-534 (SDOH), the

---

[2] *See* Sealed Addendum.

8

defendant crashed his car into the pop-up vehicle barriers outside the Joseph P. Kinneary U.S. Courthouse in Columbus, Ohio. He got out of his crashed car and ran to the parking garage where he used a trash can to break into the building. He then hid inside the building and was not found until several hours later. It was later discovered that Funderburke had used methamphetamine on the date of his offense and was prescribed suboxone for his drug addiction. It appears his conduct was, at least in part, impacted by his use of illegal narcotics.

There are two significant distinctions between Funderburke and DeFoor. First, Funderburke's crime involved the destruction of public property, after hours, when no Judges were present and no court was in session. DeFoor chose to attack someone's personal home, where families sleep and children play. The two are not comparable. Government's Exhibits 6 through 9 depict some of the damage DeFoor caused to the Vice President's home. Government's Exhibit 6 shows some of the damage to one window from just outside the Vice President's home. Government's Exhibits 7 through 9 show some of the damage from inside the Vice President's living space. *See* Government's Exhibits 6 through 9, UNDER SEAL. These are more than just shattered windows. They show the intentional destruction of the one place where everyone, much less the Vice President of the United States, should feel the most secure. DeFoor violated that security.

The Magistrate Judge expressed her apprehensions related to DeFoor's dangerousness when she noted "I have lots of concerns … The escalation of the crisis phase from his own home, to a business, to now the Vice President's house after treatment has been received in between each crisis is very concerning to me, that the crises seem to escalate." (R. 13, Transcript of Detention Hearing, PAGE ID #67). After considering the mandatory statutory factors the Magistrate Judge

9

concluded she did not "have satisfactory conditions that [she could] impose that would make [her] assured that the community would be safe and that Mr. DeFoor would be safe with the recommendation of Pretrial Services." *Id.* at PAGE ID #67-68. The Magistrate Judge was justified in her decision to detain DeFoor. Nothing has changed which should alter his custodial status.

      **E.**      **The Defendant Poses a Risk of Nonappearance**

Assuring a criminal defendant's appearance at trial is a legitimate government objective. *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003). A review of the Pretrial Services Report shows DeFoor has a history of nonappearance. In April of 2023, he was charged with failure to disclose personal information and criminal trespass. While he was found to be incompetent in November of that year, in that case a capias was ordered on three occasions. The argument his noncompliance with court orders was the result of mental health issues is not persuasive. In fact, it demonstrates why he poses a risk of nonappearance.

The Pretrial Report also shows that between 2021 and 2023 DeFoor was essentially nowhere to be found. It was reported by his mother during that time he was living in hotels, shelters or various apartments. During the period that followed, he was in and out of treatment facilities. Most importantly, it is reported he left a facility against medical advice. *See* Pretrial Services Report, p. 4. Now, DeFoor asks this Court to send him right back to such a facility. However, the Court would have little authority or control over DeFoor's movements at such a facility. In addition to leaving the mental health facility before, it is also reported DeFoor stopped taking prescribed medications during other treatments. He has been on various medications over the past several years with varying success and failure. This instability supports both statutory prongs in that DeFoor presents a danger to the community and the risk of nonappearance. The

concern DeFoor will not appear, walk away from treatment, or reoffend is not speculative. It is based on his own past conduct and history of failing to appear, walking away from treatment, and reoffending.

The United States reiterates concerns related to both the danger DeFoor poses to the community and his risk of nonappearance based on a poem he wrote which was found at his home the day of the offense. In a journal seen on his nightstand, agents found a single entry written by DeFoor. *See* Government's Exhibit 10. In it, he wrote:

> *Freedom is a cage*
> *And all the world's a stage*
> *As far as I can tell*
> *You don't know me very well*
> *I like to read, I like to eat*
> *I like to dance and move my feet*
> *I thought you were my only friend*
> *But now you'll never see me again!*

It is the final line that gives the United States the most pause and the greatest concern. Granted, it is unknown when DeFoor authored the poem. The fact remains it was written by DeFoor and is somewhat prophetic … *but now you'll never see me again!* Considering the nature and circumstances of the offense and the mental health history of DeFoor, while that line can mean any number of things, it can also lead one to believe he intends to disappear again (risk of flight) or pose a danger to himself or others.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests the pretrial order of

11

detention remains undisturbed and that DeFoor be detained for the duration of this matter.

Respectfully submitted,

DOMINICK S. GERACE II
United States Attorney

*s/Christy L. Muncy*
CHRISTY L. MUNCY (KY 88236)
Assistant U.S. Attorney
Attorney for Plaintiff
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Office: (513) 684-3711
E-mail: christy.muncy @usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on this 10th day of February 2026, on Defense Counsel via the Court's ECF filing system.

*s/Christy L. Muncy*
CHRISTY L. MUNCY (KY 88236)
Assistant United States Attorney

12