# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

                                        **Case No. 1:26-cr-1**

  **v.**

                                        **JUDGE DOUGLAS R. COLE**

**WILLIAM DAVENPORT DEFOOR,**    **Magistrate Judge Bowman**

    **Defendant.**

## OPINION AND ORDER

The Magistrate Judge ordered Defendant William Davenport DeFoor detained pending trial in this criminal matter, in which DeFoor is indicted for his alleged role in using a hammer to attack the Vice President's Cincinnati residence, along with a Secret Service vehicle stationed outside the home, in the middle of the night. (Order, Doc. 11; Indictment, Doc. 15). More specifically, the Magistrate Judge found, based on the evidence presented at the detention hearing, that DeFoor both posed a danger to the community and presented a significant flight risk, neither of which could be sufficiently addressed by any condition or set of conditions surrounding his release. (Doc. 11, #27–28). DeFoor now moves under 18 U.S.C. § 1342(b) to revoke the Magistrate Judge's detention order. (Doc. 18). The Court held a hearing on that motion on February 18, 2026. (*See* 2/18/26 Min. Entry). At that hearing, the Court requested the parties provide additional information, and the parties completed that task by March 2, 2026. (Docs. 22, 23, 24). Having considered the evidence and arguments that the parties presented in their briefing and at the hearing, along with

the supplemental information that they have since provided, the Court concludes DeFoor is properly detained pending trial. Accordingly, the Court **DENIES** DeFoor's Motion (Doc. 18). As further described below, though, it does so without prejudice to DeFoor raising this issue again if he can identify a more secure psychiatric treatment facility to which he could be committed pursuant to a court order (whether issued by this Court or a state court).

## BACKGROUND

On January 14, 2026, the grand jury indicted DeFoor in connection with his alleged attack on the Vice President's residence on January 5, 2026. (Doc. 15). The indictment contains three counts: (1) physical violence against person or property in restricted building or grounds under 18 U.S.C. § 1752(a)(4) and (b)(1)(A); (2) willful injury or depredation of property of the United States under 18 U.S.C. § 1361, and (3) assaulting, resisting, or impeding certain officers under 18 U.S.C. § 111(a)(1) and (b). (*Id.* at #37–39). The most serious of those, count three, exposes DeFoor to a potential term of incarceration of up to twenty years. 18 U.S.C. § 111(b).

According to DeFoor's motion, the events at issue took place shortly after midnight on January 5, 2026, while DeFoor was "in the midst of a significant mental health crisis." (Doc. 18, #43). As counsel further relayed at the hearing, DeFoor has a substantial history of mental health concerns—principally schizophrenia. He has received in-patient treatment for mental health issues before and takes medications to treat his condition. (*Id.* at #46; *see id.* at #53). According to counsel, that evening, DeFoor suffered a psychotic break. He left his parents' home (where counsel reports

2

he was living) without their knowledge sometime before midnight, carrying a hammer in a black backpack. (Gov't Opp'n, Doc. 20, #60). He then walked roughly three miles to the Vice President's Cincinnati residence. (*Id.*). The parties dispute various aspects of what transpired when he arrived. But suffice to say it appears that, shortly after he got there, he removed the hammer from the backpack and used it to strike a Secret Service-owned vehicle. (Compl., Doc. 2, #5). He then headed for the Vice President's home, ignoring commands from the Secret Service agents to stop. (*Id.*). When he reached the home, he used the hammer to smash windows on the front of the residence and then dropped the hammer and tried to flee. (*Id.* at #6). Secret Service agents and members of the Cincinnati Police Department apprehended him shortly thereafter without incident. (*Id.*).

DeFoor had his initial appearance on January 6, 2026. (1/6/26 Min. Entry). There, the Magistrate Judge ordered temporary detention. (Doc. 8). A week later, she held a detention hearing, (1/13/26 Min. Entry), where she concluded that the United States had satisfied its burden of showing that DeFoor both presented a danger to the community and a risk of nonappearance, (Doc. 11). She cited eight factors in support of that determination: (1) the weight of the evidence; (2) the length of detention were DeFoor convicted; (3) his criminal history; (4) his participation in criminal activity while on probation, parole, or supervision; (5) his history of use of weapons (the hammer); (6) a lack of stable employment; (7) his prior failures to appear in court as ordered; and (8) his prior attempts to evade law enforcement. (*Id.* at #27–28).

3

On January 29, 2026, DeFoor moved to revoke the detention order. (Doc. 18). He begins by noting the statutory presumption in favor of release, a presumption he says the government has failed to rebut. (*Id.* at #44). Beyond that, DeFoor's central claim is that "this is a case of mental illness, not of politics." (*Id.* at #46). So while he does not minimize the threat that a person suffering from mental illness wielding a hammer to attack persons or property might pose, he claims there are conditions of release that would assure both public safety and nullify any risk of non-appearance. (*Id.*). In particular, DeFoor argues that, instead of pretrial detention, he should be "released into a locked-door psychiatric facility." (*Id.* at #45). That way, DeFoor says, the Court can remain certain of his location, and he will be unable to harm others in the community even if he has another psychiatric episode. (*Id.*). But he will also be able to receive treatment for his mental illness, treatment that he contends is lacking in the pretrial detention facility in which he is currently located. (*Id.* at #48). At bottom, the defense claims that "Mr. DeFoor needs treatment and a stable environment, not pretrial detention." (*Id.*).

The government sees things a bit differently. While not disputing the statutory presumption in favor of release, it says that here, each of the four factors that the Court must consider under 18 U.S.C. § 3142(g)(1)–(4) favors detention. (Doc. 20, #63–70).

At the hearing, it quickly became clear that DeFoor was not exactly challenging the concept that he should be securely confined to a known location, so much as claiming that he had identified an alternative *method* of achieving that

4

objective—treatment at an in-patient psychiatric facility—which should ameliorate any concerns about ongoing threats to public safety or risk of non-appearance. And the government, for its part, was not denying that DeFoor would benefit from psychiatric treatment, but rather asserting that DeFoor could receive such treatment while in pretrial detention. It also contested whether DeFoor's preferred alternative location could provide sufficiently secure confinement.

As a result, much of the hearing turned into an inquiry about the nature of the "detention" that would occur at the proposed facility,[1] on the one hand, and the nature of the treatment that DeFoor would receive while in standard pretrial detention, on the other. The parties disagreed on both fronts. But, because the parties were presenting arguments on those topics, rather than evidence, the Court provided them the opportunity to supplement with additional information as to both. They did. (*See* Docs. 22, 23, 24).

With that, this matter is ripe.

## LAW AND ANALYSIS

When a Magistrate Judge orders a defendant detained pending trial under § 3142(e) as a flight risk or danger to the community, and the defendant challenges that determination before the district court, the "district court reviews the magistrate

---

[1] The Court is not identifying the particular facility that DeFoor proposed. Both parties agreed that, if DeFoor were transferred there, exposure of his location could give rise to valid safety concerns in light of the nature of this case and the level of public interest in it. True, the Court is denying DeFoor's request for release to that facility. But DeFoor may well appeal the Court's ruling, and if that happens, it is always possible that the appeals court may reverse. So, in the interests of preserving the facility as a viable (and safe) treatment location should that occur, the Court declines to identify it.

5

judge's decision de novo." *United States v. Roberson*, No. 1:21-cr-127, 2022 WL 2980530, at *2 (S.D. Ohio July 28, 2022) (cleaned up) (collecting cases). As part of this review, the Court considers the entire record, including the Pretrial Services Report, the original detention hearing, all briefings filed in the matter, and any evidence the parties tender at the hearing. *United States v. Carter*, No. 1:20-cr-62-1, 2021 WL 687858, at *2 (S.D. Ohio Feb. 23, 2021).

In conducting that review, the "default position of the law" is that "a defendant should be released pending trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). At the same time, the Court must balance the law's concern for the liberty of a potentially innocent defendant with the need to protect the community and to preserve the integrity of judicial proceedings. So if there is no condition or combination of conditions that will both (1) "reasonably assure the appearance of" the defendant at future proceedings (the risk-of-flight factor), and (2) reasonably assure "the safety of any other person or the community" (the dangerousness factor), a court must deny pretrial bond. 18 U.S.C. § 3142(e). But the government bears the burden of proof on both of these issues, and it must show "risk of flight by a preponderance of the evidence, and it must prove dangerousness to any other person or the community by clear and convincing evidence. *United States v. Shuklin*, No. 19-4171, 2020 WL 2992522, at *2 (6th Cir. Mar. 18, 2020) (quoting *United States v. Hinton*, 113 F. App'x 76, 77 (6th Cir. 2004)). When evaluating whether detention is appropriate, the Court considers (1) "the nature and circumstances of the offense"; (2) "the weight of the evidence against the defendant"; (3) "the history and

6

characteristics of the defendant"; and (4) "the nature and seriousness of the danger to any person of the community that would be posed by the defendant's release." *United States v. Parish*, No. 1:21-cr-127-14, 2022 WL 3654892, at *4 (S.D. Ohio Aug. 25, 2022) (citation omitted); *see also* 18 U.S.C. § 3142(g).

### 1. Nature and Circumstances of the Alleged Offense.

The nature and circumstance of the alleged offense weigh in favor of detention. DeFoor allegedly used a hammer to attack the Vice President's residence in the middle of the night. (Doc. 2, #5–6). Admittedly, it is difficult to know whether he did so for political or ideological reasons, whether he intended to enter the residence or not, or whether he wished to cause physical harm to anyone located inside. But attacking a home in the middle of the night, where people, including young children, could be sleeping, strikes the Court as the type of offense that suggests an offender presents a risk of dangerousness.

DeFoor argues otherwise, claiming that the crime amounts to essentially a form of vandalism, notable only because the residence at issue was the Vice President's home. (Doc. 18, #49). The Court offers two observations in response.

First, using a hammer in an attack on any residence (the Vice President's or not) almost certainly could result in grievous injuries. A homeowner, awoken to the sound of windows shattering, would surely respond, perhaps injuring themselves on the shards of glass they encounter, or ending up engaging with the hammer-wielding assailant. True, neither of those actually occurred here, but the nature of the offense itself created a substantial *risk* of harm.

7

Second, the locus of the attack did not merely *happen* to be the Vice President's home. The likelihood that DeFoor would walk more than three miles from home, pick a random house, and it would merely *happen* to be the Vice President's is vanishingly small. So for present purposes, the Court treats the attack as directed at the Vice President's house. And attacks on senior government officials and their homes are matters that courts, and the public, must take seriously.

In short, the nature and circumstances of the alleged offense support detention.

### 2. Weight of Evidence.

What about the weight of the evidence as to DeFoor's risk of dangerousness to others and his risk of flight? The government has met its burden here as well, at least on the first.

As to the former, the Court begins by observing that the weight-of-the-evidence factor turns on evidence of *dangerousness*, not evidence of guilt. *Stone*, 608 F.3d at 948 (citation omitted). But here, the two collapse at least to some extent, as the government relies on the alleged offense conduct (which was inherently dangerous) as one aspect of showing dangerousness. In that circumstance, the evidence (or lack thereof) that he actually committed this particular offense thus also weighs in the dangerousness calculus.

Here, there is virtually no question that DeFoor engaged in the underlying conduct at issue. He does not meaningfully argue otherwise. Secret Service officers watched DeFoor engage in the conduct in question and, along with police officers,

8

apprehended him basically at the scene. (Doc. 2, #5–6). True, questions remain about both (1) the role that his mental illness may have played, and (2) whether he did or did not have political or ideological motivations for engaging in the conduct. And there may well be technical defenses to some of the charges, or difficulties may arise in proving one or more elements of a particular offense. But the sole question now concerns what the evidence shows as to his dangerousness. And the strong weight of the evidence shows that, at least when suffering from episodes of mental illness, he is willing to attack at least property with a hammer. That is dangerous.

Compounding the matter, this is not the first instance of such behavior. During a previous episode of mental illness, he attacked a storefront in town, breaking the plate glass windows there. (Doc. 18, #52).

Beyond that, the current events seem to mark something of an escalation. The Court's understanding is that he attacked the storefront outside of normal business hours. Here, by contrast, he attacked a residence, and did so in the middle of the night. True, the Vice President and his family were not home at the time, but there is nothing in the record that suggests that he knew that was the case. And unlike stores, homes tend to be occupied at night. Moreover, in the previous incident, nothing suggested that he targeted a particular location. Here, though, the evidence strongly suggests that he left his home with a specific target in mind. Even if he did not have such an intent when he left his home, as already noted, the likelihood that he walked nearly three miles and then picked the Vice President's home at random

9

is vanishingly small. So on both fronts, the current conduct represents an increase in the threat that his behavior poses to the safety of those in the community.

DeFoor argues that he is not dangerous when not experiencing an episode of mental illness. (*Id.* at #53). That may well be so. But that ends up highlighting another problem. DeFoor does not know when he will experience another episode related to his mental illness. Indeed, he has received treatment (including in-patient treatment) before and has appeared stable afterwards, only to suffer recurrences. (*Id.* at #52–53). Not only that, but DeFoor has lived with his parents (both of whom, defense counsel noted at the hearing, are physicians) throughout his treatment, so they are likely familiar with his symptoms and any signs that a break may be coming. (*Id.* at #51–53). Indeed, his family and treating psychiatrist apparently realized his symptoms had appeared again shortly before this incident. (*Id.* at #53). Yet, when he seemingly suffered an acute break, he managed to walk away from his home in the middle of the night with a hammer in a backpack. So even if DeFoor is only dangerous when experiencing an acute mental-health crisis, it seems they come on quickly and unpredictably. As a result, that fact does little to ameliorate the evidence of dangerousness.

To be clear, the Court is not blaming DeFoor for his ongoing and seemingly intractable struggles with mental illness. But in the context here, the Court's obligation is to assess the implications of those struggles for the dangerousness that DeFoor presents. And on that front, the Court is left with a strong conviction that the evidence on dangerousness weighs strongly in favor of detention.

The evidence also suggests, at least to some extent, that DeFoor may be a flight risk. It is often difficult to predict the behavior of those struggling with severe mental illness. Indeed, even trained physicians living in the same house seemingly did not detect that DeFoor was about to leave the premises. That could well happen again should he be released from detention.

As discussed below, DeFoor responds that an in-patient treatment facility would address that concern. (*See generally* Doc. 18). But, as also discussed below, that facility is not "secure" in the sense of "detention-facility secure." The Court is not convinced that he could not leave should he be so inclined. And there are also reasons to think that flight may be attractive. On one of the charges, DeFoor is facing a sentence of up to twenty years. The possibility of a long sentence can make flight seem an attractive alternative. *See, e.g.*, *Shuklin*, 2020 WL 2992522, at *1 (noting a potential sentence of twenty years in prison provided a "strong incentive to flee"). So this supports detention as well.

### 3. DeFoor's History and Characteristics.

Next up is the factor asking the Court to assess DeFoor's history and characteristics. On this front, there are aspects of DeFoor's history and characteristics that point in both directions. DeFoor comes from a strong family, and his parents strike the Court as responsible persons who would do their best to ensure that DeFoor remains in the in-patient treatment facility, or in their home if he ended up there. But, at least as to the latter, the Court notes that they were undoubtedly doing their best to care for their son and prevent him from engaging in misconduct

11

on January 5, 2026, as well. Yet he nonetheless was able to leave their home undetected.

Probably the most notable part of his history and characteristics, though, relates to the information already detailed above. It appears that DeFoor suffers from severe mental illness, and, at least when in the midst of an (unpredictable) acute episode, engages in dangerous and harmful conduct. Indeed, he has engaged in acts of property damage in those circumstances before. That cuts against release.

### 4. Nature and Seriousness of the Danger to the Community.

That leaves the last prong: the evidence showing the nature and seriousness of the danger to the community created by DeFoor's release. The Court will not reiterate all of the information it discussed above, much of which weighs on this prong as well. But to summarize: the crime charged is serious; DeFoor has engaged in similar activity before, but appears to be on an escalating trendline; and his mental health condition is unpredictable at best. That all suggests he presents a substantial risk of harm to the community. So this last prong also favors detention.

\* \* \*

But the Court acknowledges that all of the above is, in some regard, attacking a strawman. That is because, so far as the Court can tell, DeFoor is not really disputing that some form of confinement is appropriate on the facts here. Rather, DeFoor simply contends that the Court can address any danger he represents through a condition of release that requires treatment at an in-patient psychiatric facility. He contends that this would result in secure confinement, thereby ameliorating any

12

prospect of harm or flight, while also allowing him to get the treatment that he needs. (*See generally* Doc. 18).

Based on the evidence available to the Court about the facility he recommends, though, the Court is not convinced. The Court's initial understanding was that the facility would be akin to a state involuntary confinement facility, the type of facility used to secure, for example, those found not guilty by reason of insanity of some serious crime. To illustrate, the State of Ohio, as best the Court can tell, operates six psychiatric hospitals across the state that deliver care to patients who are committed to those facilities by criminal courts.[2]

The facility that DeFoor recommends by contrast, is a private facility. Indeed, the Court is informed that the facility will not accept persons committed by court order. Rather, the patient must voluntarily choose to commit him- or herself. And, while the facility is perhaps "secure" in some sense of the word (a door needs to be "buzzed open"), it is nowhere near as secure as a detention facility. As just one example, the windows are plain (non-ballistic) glass, meaning a patient (particularly one who has the proclivity for doing so while in the midst of a psychiatric episode) could break the windows and escape; patients also have been known to "piggyback" off of staff to exit through the locked doors, and visitors are not required to submit to any security screening. In fact, the facility's security personnel report that the facility has had multiple escape attempts in the past two years. Beyond that, because DeFoor

---

[2] Ohio Dep't of Behav. Health, *Regional Psychiatric Hospitals*, https://perma.cc/8YU2-8Q27.

would not be committed to the facility by court order, his guardian (who is his mother) could ostensibly check him out of the facility should she so desire.[3]

Nor is the Court convinced that DeFoor cannot get at least adequate treatment in the facility where he is currently located. By all accounts, he is receiving his prescribed medications. And facility personnel have made clear that he can meet with psychiatric care providers of his choosing. The Court has no doubt that the medical treatment at DeFoor's proposed alternative facility would be better and more intensive. But given the risk of dangerousness that DeFoor presents, the Court concludes that this is not a prudent risk to take.

At bottom, the Court concludes both (1) that detention is warranted, and (2) that DeFoor needs treatment. The facility he proposes does not sufficiently meet the Court's concerns as to the former, and he appears to be receiving the latter where he is currently detained. That said, if DeFoor could identify a facility that has greater security, akin to a detention facility, the Court may be willing to revisit this determination.

## CONCLUSION

For the reasons explained, the Court **DENIES** DeFoor's Motion to Revoke Order of Detention (Doc. 18).

---

[3] In making that observation, the Court does not intend to imply that his mother *would* do so. The point is simply to highlight the differences in the nature of the confinement at issue in this facility as opposed to that of a more typical pretrial detention facility.

**SO ORDERED.**

<u>March 11, 2026</u>
**DATE**

_____
**DOUGLAS R. COLE
UNITED STATES DISTRICT JUDGE**